Seawell, J.
delivered the Opinion of the Court:
The case finds, that Neill M1-Arthur, in 1775, was taken prisoner of war by the American People, then in resistance to British authority, and that in July, 1777, he being then a prisoner, was permitted to return, upon security, from Maryland to this State, for the purpose of taking i he oath of allegiance ; or, in case of refusal, to return hack to confinement : That upon his return to this State, he declined taking the oath, and on the 4th July, Í777, conveyed the lands in question to his son, in consideration of natural love and affection and five shillings, and returned back to captivity according to his engagement ; that he is mentioned by name in the Acts of Confiscation ; that aftt r the year 1782, in Cumberland County, á judgment was recovered against him, upon a petition, in conformity to the Act of Assembly respecting claims against persons who had forfeited their esta%s, upon Which, execution issued, and the land in question sold to Plaintiff’s ancestor. And the question presented for this Court to determine, in substance, is, Whether the Acts of Confiscation, passed in the year 1777, 1779 and 1782, for they contain the substance of all the Acts, "have the effect, under the circumstances of this case, to render inefficient the conveyance to the son ? And this leads to an examination of the Acts of 1777, extending the right of disposition to such as were in the Country who should, 'refuse to take the oath of allegiance.
*118 Tt may, however, not be amiss, first to strip this case of a feature which was ascribed to it in the argument—namely, that Neill M1, Arthur, by joining the enemies (as they were called) of the Country, committed treason, and-that the conviction (as the Acts of Confiscation have been called) relates back to the time of the offence, and will avoid all intermediate conveyances. Now the first Act upon the subject of treason, passed in April, 1777, previously to defining the offence, expressly' exempts prisoners of war from allegiance ; so that the right which the Sovereignty of the Country possessed to confiscate, must, if it be admitted to exist, depend upon a broader basis than the peculiar conduct of the party to be affected. This right did exist, and depended upon the great principle of necessity—that the Sovereign Power of the State may act as it pleases with the effects of its enemies ¿ noton account of traitorous conduct in adhering to their lawful Sovereign, and fighting his battles ; but upon the principle, that each, of the contending parties may rightfully do all in his power to weaken his adversary, which is supposed to be effected by stripping his subjects of their property, and rendering them less able to contribute to the support of their Sovereign’s Government. The Acts of Confiscation, are not to be considered as a conviction by the grand inquest of^he Nation, as an Act of Attainder might be j but as the exercise of a mighty power by the Sovereignty of the Country to weaken an opposing adversary.
If we, therefore, attend to this radical distinction, we shall evidently perceive the impossibility of the Acts having any retrospective operation that is not confined to the property of the enemy. If an estate has been conveyed from one enemy to another enemy, it would still remain within the control of this power; but whenever it has passed .to the hands of those who belong to the Sovereign, the property then has the guarantee of the constitution.
*119 Let it then first be asked, What Law, either in the . Statutes, or Common Law or North Carolina, or m the Law of Nations, prohibited those who, before the 4th of July, 1776, had good title and could convey, from conveying afterwards, although they did refuse to become members of the new Government J No such Statute was passed, nor is it believed to be found in any principle of the Common Law. But from the cases cited from VaU tel, it would seem as if this does exist by the great Laws of Nature, supposed to be understood and adopted by every formation of Civil' Society at its commencement— that whenever a new kind of Government shall be adopted, those who acquire property upon the faith of the old one, may dispose thereof, and remove their persons. If this condition were not the case of every inhabitant of the State, upon the change of Government, from the principles last stated, let us see whether they have not, in effect, been recognized by the Acts of Assembly ; and this brings us to the-examination of the several Acts we before proposed.
The Act of April 1777, contains a clause that persons of a particular description, namely, -officers of the late King, merchants and factors who had traded with Great Britain or Ireland, within ten years, should be compelled to take the oath of allegiance (this was not required of Neill Af‘ Arthur, for he was a prisoner of war) they were to be cited for that purpose; and on refusal, were to depart, and in case of departure, might lawfully sell. Now what was the object and policy of this Law ? To favour one particular description of men ? Surely not. What then? Why, these sort of men, most of them Scotchmen who had smarted for rebellion, were suspected, and the Country thought that it was interested in getting them away, lest they might instil principles of loyalty to the King. The design, therefore, of the clause, and indeed great part of the Act, was to bring this matter to the test, *120 at]^ Set of such persons, without its ever being thought of as a provision to enable them to sell. And in- ° \ deed upon looking at the Act, it would seem that this was put in through caution, lest the refusal to take the oath, 'might disqualify them from selling. Let it be re-ñiembered, M'AHfiur being a prisoner at war, was no£ held to allegiance, of required to swear.
The Act of Nov. 1777, next is passed ; in the first partof which, all the Act of April is re-enacted, and the Act then proceeds to direct that every body should take the ¡-oath of allegiance, or depart, except permitted by the County Courts to remain. Those who remain, after refusing to take the oath, are restrained from conveying their property for a greater period than one year, and are declared to forfeit all, in case they remove without permission. They were,' therefore, recogaiztd as person^ capable of holding lands, and are net considered as affected by the change of the Government, in any other manner than should be prescribed by Law.
The Act of 1779 is then passed, confiscating the estates of those who, on the 4th of July 1776, were absent from the United States, or who since that time withdrew themselves, extending the operation back to the 4th of July 1776. And it is remarkable, that in the Mth section of the Act it represents, that many persons who had refused to take the oath of allegiance, were compe lled to, leave the State in consequence of the Acts of April and November 1777, and had omitted to sell their lands and appomt attoraies, “ whereby many lands of the persons so de? scribed, are yet undisposed of, and still "continue to be and remain to the use of the samethat all such lands, not disposed of bona fdc, for a valuable consideration actually paid, shall be forfeited to the State. This Act then contains an explicit declaration, that those who had refused to take the oath and departed, still retained their *121 ^States, and is equivalent to saying they were not defacto affected by the change of the government. If they did retain their property, they also retained the right of disposing of it, unless forbidden by law. This was only the case with those who remained by permission, after refusing to qualify, and the Act passed after the 4th of July 1777, namely, November 1777-
Then as to the consideration. A citizen of the country, who has committed ho critile nor come within the operation of either of the Acts, claims title to the lands in virtue of a conveyance,- which he alleges, passed to him the estate at the time of its execution. The only inquiry then, is, Did the estate then pass ? What was there to hinder it ? The Acts of Confiscation, respecting the fay-merit of the consideration, had not then passed. No question about a fraudulent conveyance to defeat creditors, is now made. And the father being about to abandon his country, we can readily account for his conveying that he could no longer enjoy himself to his child, whom he was bound to provide for.
If policy, however, is to have any share in determining wfiat kind of contracts were effectual, it would seem, upon the very principles of the right to confiscate, that those for which no valuable consideration was given, were most to be favoured, inasmuch as they impoverished the subjects of the enemy. But it is far from being believed, that the kind of consideration has any sort of influence. The only question must result in this, Was there such conveyance as the law recognized to be valid and to pass the éstate ? If there wás, and the lands then became vested in the Defendant, it required an arm more powerful than the Legislature, to wrest it from him, without any misdeed.
*122 I am of opinion, therefore, upon every ground 1 can consider the case, that there should be Judgment in favour Qf Defencjanf and that consequently the rule for a New Trial be made absolute. It has however been said, that the ordinance of the Convention in 1776 prevented these persons from disposing of their estates. That ordinance is confined to persons in the State, so far as it prohibits a conveyance ; and as to those out of the Stats, it is expressly left to the future Legislatures to make regulations respecting them.